**EUROSPARK INDUSTRIES, INC.,**
Debtor–in–Possession,
Plaintiff,

v.

**The UNDERWRITERS AT LLOYDS SUBSCRIBING TO THE RISK ON COVER NO. 97FA0071010A, and the Underwriters at Lloyds Subscribing to the Risk on Certificate No. FC10328697, Defendants.**

**Eurospark Industries, Inc., Debtor–in–Possession, Plaintiff,**

v.

**Massachusetts Bay Insurance Company, Defendant.**

No. 1:05–CV–0208 (ENV)(JMA).

United States District Court,
E.D. New York.

July 2, 2008.

See also 288 B.R. 177.

Joshua L. Mallin, Esq., Weg & Myers, P.C., New York, NY, for Debtor–in–Possession.

Daniel Joel Friedman, Esq., Abrams, Gorelick, Friedman & Jacobson, P.C., New York, NY, for Massachusetts Bay Insurance Co.

Daniel C. Marotta, Esq., Raymond J. Dowd, Esq., Dowd & Marotta, New York, NY, for interested party Michael Spiegel.

## MEMORANDUM and ORDER

VITALIANO, District Judge.

Plaintiff and debtor-in-possession Eurospark Industries, Inc. ("Eurospark"), a former manufacturer of gold jewelry, has sought relief under insurance policies issued by defendants Underwriters at Lloyds ("Lloyds") and Massachusetts Bay Insurance Company ("Mass. Bay") for var-

ious claims of loss relating to the alleged theft of gold from its premises in March 1998. Disclaiming coverage, Lloyds and Mass. Bay have each moved for summary judgment. Magistrate Judge Joan M. Azrack, to whom these motions had been referred, has filed her report recommending that Lloyds' motion be granted in part and denied in part, and Mass. Bay's motion be denied. The Court accepts and concurs in Judge Azrack's recommendation.

### Facts and Procedural History

Eurospark's business was manufacturing at its Long Island City factory raw gold into finished chains and jewelry.[1] While in business, Eurospark always maintained various quantities of gold at its factory, including raw gold, finished products, and work-in-process. Most of the gold maintained there was on consignment to Eurospark by Fleet Precious Metals Inc. ("Fleet"). Eurospark was obligated to pay interest to Fleet on the consignment gold in its possession and, as it sold finished gold products to its customers, would make payments to Fleet. Gold is generally bought and sold at a set price known in the gold industry as the London Bullion Brokers 2nd fixing price, or 2nd London Fix. Eurospark's profits were derived from the charge it imposed on its customers for labor involved in manufacturing jewelry.

On March 14, 1998, an armed robbery supposedly occurred at the factory, with the loss of a quantity of gold.[2] Eurospark subsequently submitted claims under its insurance policies with Lloyds for the val-

ue of the stolen gold and with Mass. Bay for business income lost as a result of the robbery.

### I. The Lloyds Claim

During the relevant period, Eurospark had both primary and excess "Jewellers Block" policies with Lloyds totaling $5.5 million in coverage.[3] Following the alleged theft, Eurospark filed a proof of loss statement in which it claimed that it had sustained a loss of roughly $4 million based upon (a) the value, according to the relevant 2nd London Fix price, of 10,643 fine troy ounces (FTO) of the stolen gold, and (b) $959,109 in the value of labor lost in that portion of the gold that had been manufactured or was in the process of being manufactured into chains and jewelry. At some point after the claim was filed, Eurospark retained Bourget & Associates, Inc. ("Bourget"), a forensic accountant, to prepare a so-called "roll-forward" calculation to support its claim. A roll-forward calculation is done in lieu of a perpetual inventory, that is, a calculation starting with the known inventory as of the date of the last physical count, then adding "gold in" by FTO and subtracting "gold out" up to the date of the robbery. The roll-forward inquiry in this case began January 1, 1997 (the date of a physical count which had been audited and supervised by Eurospark's accountant, BDO Seidman) and extended to March 14, 1998, the date of the robbery.

Pursuant to a cooperation clause in the policy, Lloyds also demanded that various

---

1. Unless otherwise noted, the facts and procedural history set forth in this decision are undisputed.

2. Lloyds and Mass. Bay allege that the robbery was staged by Eurospark's president, Michael Spiegel, but those allegations are not before the Court for purposes of the motions.

3. In relevant part, the excess policy is governed by the terms and conditions contained in the primary policy. Although Eurospark seeks coverage under both policies, for ease of reference, the Court refers only to the Lloyds' "policy."

witnesses for Eurospark appear for examination under oath (EUO). Numerous witnesses appeared and testified, including Eurospark's president and sole shareholder, Michael Spiegel. Spiegel's testimony at his EUO forms the primary basis for Lloyds' disclaiming coverage in its instant motion. In particular, Spiegel was asked about two confirmations from Fleet in April 1997 that showed payments to Fleet totaling over $1 million for 3000 FTO of gold, resulting in a reduction to Eurospark's consignment account by that amount. Spiegel initially characterized these transactions as a purchase by Eurospark and stated that the purchase was made with extra money from Eurospark's accounts receivable. When confronted at the EUO both with Eurospark's bank statements for April 1997, which did not show the $1 million coming out of Eurospark's account, and with Eurospark's gold inventory for that period, which did not show a corresponding increase in the amount of gold, Spiegel advised the examiner that all questions regarding such records should be referred to his accountant, BDO Seidman. During this same line of inquiry at the EUO, Spiegel was also asked about one of Eurospark's customers, Mosexpo Moscow. Spiegel did not affirmatively state that the April 1997 transaction had anything to do with Mosexpo—though, Eurospark points out, Spiegel was not asked directly whether this transaction had any connection with Mosexpo.

After an elapse of time, in papers filed in connection with Eurospark's motion for summary judgment in the bankruptcy court (ultimately unsuccessful), and in responses to interrogatories in that proceeding, and in a Bankruptcy Rule 7030 deposition, Spiegel's description of the April 1997 transaction had changed significantly. Re-

gardless the epiphany, Spiegel now recalled that the gold was not purchased by Eurospark, but by Mosexpo. According to Spiegel, Mosexpo placed a large order with Eurospark in early 1997 requiring 3000 ounces of gold to be manufactured into jewelry. Eurospark either did not have or did not wish to pay the $1 million necessary to acquire the gold from Fleet's consignment line, so it was agreed that Mosexpo would pay Fleet directly for the gold. Shortly after Mosexpo paid Fleet, however, Mosexpo cancelled the jewelry order with Eurospark, apparently due to a change in Russian tax laws that had made the order unprofitable for Mosexpo. However, Mosexpo still wished to take the raw gold for which it had already paid. Therefore, some weeks after the cancellation of the order, it picked up 3000 ounces of gold by messenger from Eurospark's factory. Mosexpo's order and cancellation were apparently given orally to Spiegel over the telephone, and Eurospark does not have records specifically reflecting Mosexpo's order, cancellation, or pickup of the gold.[4]

Lloyds now disclaims coverage on the grounds that Eurospark voided coverage when Spiegel gave false testimony at his EUO regarding the April 1997 transaction, and further, that Eurospark breached its obligations under the policy by failing to keep records regarding the Mosexpo transaction; it claims that the contract language entitles it to summary judgment as a matter of law. In the alternative, Lloyds moves for partial summary judgment dismissing that part of Eurospark's claim seeking indemnification for the "labor component" of the stolen gold, which, it contends, was not covered under the policy in any circumstance.

---

4. Eurospark did, however, issue contemporaneous transfer memoranda to Fleet showing that the gold was for Mosexpo and would be paid for via wire transfer from a third party.

## II. The Mass. Bay Claim

Eurospark also filed a separate claim with Mass. Bay for roughly $1.5 million in lost business income and for covered extra expenses resulting from the theft of the gold, which, pursuant to a co-insurance provision, Eurospark reduced to just over $1 million. The Mass. Bay policy insures for the loss of business income sustained during the "period of restoration" following a loss, which was to begin on the date of a physical loss of the property and end on the date when the lost property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Mass. Bay now disclaims on the grounds that the policy excluded coverage for the stock on Eurospark's premises and, in the alternative, that Eurospark's records as to the gold allegedly stolen were so poor as to render its claim speculative.

## III. Procedural History

Eurospark filed for bankruptcy in August 1998, and the instant action was commenced as separate adversary proceedings against the defendants in the bankruptcy court. The adversary proceedings were consolidated and referred to Judge Edward R. Korman of this Court, who then returned the case to the bankruptcy judge with instructions to complete all pre-trial discovery and return it to Judge Korman for trial. On January 13, 2005, the case was transferred back to Judge Korman for all purposes. On January 26, 2006, Judge Korman referred the instant motions for summary judgment to Magistrate Judge Azrack for a report and recommendation. On April 20, 2006, overall responsibility for the case was transferred to this Court. On February 1, 2008, Magistrate Judge Azrack issued her Report and Recommendation ("R & R"), recommending that this Court grant Lloyds' motion for summary judgment only with respect to Eurospark's

claim for lost labor value and otherwise deny it, and deny Mass. Bay's motion for summary judgment altogether. Eurospark, Spiegel as intervenor, and Lloyds have each filed objections to the R & R. Mass. Bay has not filed an objection.

### Magistrate Judge's Report and Recommendation

More specifically, as to Lloyds' motion to dismiss on the grounds of fraud, although Judge Azrack notes that Lloyds has adduced evidence that would permit a reasonable person to conclude that Spiegel had lied under oath regarding the April 1997 transaction, she recommends denial of summary judgment because the motion ultimately turns on assessments of credibility, which, she notes, are generally questions for a jury to determine.

As to Lloyds' motion based on Eurospark's failure to keep books and records, Judge Azrack recommends that, drawing all inferences in favor of the nonmovant, a trier of fact could find that the absence of the April 1997 transaction from Eurospark's books and records was inconsequential to determining any loss. Accordingly, she recommends that summary judgment should be denied on this ground as well.

But, as to Lloyds' alternative claim that the "labor component" of the stolen gold was not insured, Judge Azrack determined as a matter of law that coverage for the loss of "stock" under the Lloyds policy did not include the cost of labor. It is for this reason, therefore, she recommends the grant of partial summary judgment for Lloyds.

Finally, as to Mass. Bay's motion for summary judgment, although she finds that it may be difficult for a fact finder to determine from Eurospark's records precisely how much business income was lost, Judge Azrack notes that the robbery of the gold did have some impact on Euros-

park and had to have been covered to some extent under the Mass. Bay policy (including a significant charge for extra interest expense as a result of a loan made necessary by the robbery). Consequently, Judge Azrack recommends the denial of Mass. Bay's motion in its entirety.

### Standard of Review

When a magistrate judge is assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party, "the magistrate judge shall enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed.R.Civ.P. 72(b)(1). In reviewing such an R & R, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, depending upon history, one of two standards apply. *See Urena v. People,* 160 F.Supp.2d 606, 609–10 (S.D.N.Y.2001). Unobjected to findings of the R & R may be adopted by the district court so long as they are not clearly erroneous. *Tsabbar v. Eason,* No. 04–cv–10215, 2006 WL 3755178, at *2 (S.D.N.Y. Dec.21, 2006); *Knoll v. Equinox Fitness Clubs,* No. 02–cv–9120, 2006 WL 2998754, at *1 (S.D.N.Y. Oct.20, 2006). But, findings that are timely objected to require a *de novo* determination by the district judge. Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 674, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The *de novo* standard requires that the district judge make an "independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F.Supp.2d 457, 466 (S.D.N.Y.1999) (quoting *Raddatz,* 447 U.S. at 690, 100 S.Ct. 2406 (Stewart, J., dissenting)).

Since Eurospark, Spiegel, and Lloyds have all timely objected to the R & R as to Lloyds' motion, the Court must determine that motion *de novo.* But, given that no party has filed objections to the R & R recommending denial of Mass. Bay's motion, the Court will simply apply the clearly erroneous standard in considering its adoption.

### Summary Judgment Standard

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original); *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 90 (2d Cir.2002). Material facts are those, which given the substan-

tive law, might affect the suit's outcome. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002). In so doing, the nonmoving party may not rely on conclusory allegations or speculation. *Golden Pac. Bancorp v. FDIC,* 375 F.3d 196, 200 (2d Cir.2004) (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)); Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). Nonetheless, the nonmoving party need not make a compelling showing; it need merely show that reasonable minds could differ as to the import of the proffered evidence. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997).

### *Discussion*

### I. Lloyds' Motion Based Upon Eurospark's Allegedly Fraudulent Statements

■ A disclaimer provision in the Lloyds' insurance policy states that "[i]f the assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this insurance shall become void and all claim hereunder shall be forfeited." Lloyds argues that Spiegel's characterization of the April 1997 transaction at his EUO as a purchase by Eurospark with money from accounts receivable constitutes, as a matter of law, a knowingly false statement as to a material issue—which, Lloyds contends, is sufficient to vitiate coverage given this language.

As the R & R observes, insurance policies will often contain an explicit "false swearing" disclaimer (such as those in fire insurance policies that are mandated by New York Insurance Law § 3404(e)),[5] which voids coverage if the insured knowingly swears falsely regarding any material issue. But, Judge Azrack distinguished these "false swearing" clauses from the stated clause in this policy, which refers only to the filing of a *claim* that is "false or fraudulent ... in amount or otherwise." It was a crucial difference for Judge Azrack, who concluded that "[t]o establish its affirmative defense Lloyds must demonstrate that Eurospark made its claim for insurance coverage knowing that the *claim* was false or fraudulent; mere false swearing by itself does not nullify the coverage." R & R at 7 (emphasis in original). In any event, Judge Azrack also found that Lloyds had not carried its burden of showing as a matter of law either Spiegel's intent to defraud or the materiality of his alleged misrepresentations. All of which led to the recommendation now before this Court that summary judgment on the grounds of Eurospark's alleged fraud be denied to Lloyds.

Lloyds objects to the R & R's conclusion that only a false "claim" will suffice to void

---

5. That clause reads as follows: "This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." N.Y. Ins. Law § 3404(e).

coverage, arguing that the prohibition on making a false claim "in amount *or otherwise*" (emphasis added) includes false swearing as to a material issue. Further, it is Lloyds' position that the record conclusively establishes both Spiegel's intent to defraud and the materiality of his misrepresentations. As to Spiegel's intent, Lloyds contends that it was highly unlikely that Spiegel would have failed to recall the April 1997 transaction, which involved a large purchase of gold, and that it was entirely implausible that any purchase would have been made with money from accounts receivable.[6] Lloyds also points out that Spiegel failed to correct any statement he had made in the errata to his EUO and only changed his story in later papers filed after the adversary proceedings had been commenced. The only possible inference, Lloyds argues, is that Spiegel willfully lied at his EUO. Further, Lloyds urges that there can there be no material issue in dispute about the fact that this transaction—which reduced Eurospark's consignment balance by $1 million—was relevant to Lloyds' investigation at the time. Indeed, Lloyds notes that for purposes of verifying the roll-forward calculation, which relied on all "gold in" and "gold out" transactions between January 1997 and March 1998, a movement of 3000 FTO of gold off of Eurospark's premises was highly relevant and a quite germane subject for the examiner to inquire about.

Eurospark responds that Spiegel simply failed to recall the April 1997 transaction during his EUO and, further, that if he made any misrepresentations, they were immaterial. In his affidavit in opposition to Lloyds' motion, Spiegel ascribes his statements to a failure to recall a single transaction, among many, that occurred over a year before the EUO. It was only when he was able to focus on the transaction in later court proceedings, he avers, that he was able to recall the details of the Mosexpo purchase. Further, Spiegel points out that, throughout his EUO, he primarily responded to questions regarding this and all other individual transactions that such questions should be addressed to his accountants, BDO Seidman. At no point, Spiegel observes, did the Lloyds examiner ask him directly to connect the transaction with Mosexpo, even though from his questions, the examiner appeared to have known or suspected that Mosexpo was involved. And, more dispositively, argues Eurospark, the fact that Lloyds knew that Mosexpo was involved meant that any misinformation about the Mosexpo transaction being a purchase by Eurospark instead was immaterial to Lloyds' investigation at the time.

■ A salient point, however, towers over the debate about the clause. Assuming, as Lloyds argues, that a false statement by the insured on a material issue with intent to defraud *is* sufficient to vitiate coverage under the specific policy clause at issue here, Lloyds must still prove, under New York law (which it is not disputed applies here) that Spiegel intentionally made material misrepresentations at his EUO by clear and convincing evidence. *See Ausch v. St. Paul Fire & Marine Ins. Co.*, 125 A.D.2d 43, 45, 511 N.Y.S.2d 919 (2d Dep't 1987); *see also Varda, Inc. v. Ins. Co. of North America*, 45 F.3d 634, 639 (2d Cir.1995). Such a higher quantum of proof is mandated because "unintentional fraud or false swear-

---

**6.** Lloyds points out that there was not nearly enough cash in Eurospark's accounts at the time for Eurospark to have made such a large payment. Moreover, it argues, it would have made little sense for Eurospark to have paid down the consignment line with excess cash, given that the interest rate Eurospark paid on the Fleet consignment line was significantly lower than the prime rate of interest.

ing or the statement of any opinion mistakenly held are not grounds for vitiating a policy." *Sunbright Fashions, Inc. v. Greater New York Mut. Ins. Co.,* 34 A.D.2d 235, 237, 310 N.Y.S.2d 760 (1st Dep't 1970). As a result, it is undeniably clear that this entire defense of disclaimable coverage turns on Spiegel's credibility in his explanation that the statements upon which Lloyds bases its argument resulted from failures of recollection and were not intended to defraud.[7]

In federal court, credibility is, of course, generally for a jury as fact-trier to determine. *See Staten Island Supply Co. v. Lumbermens Mut. Cas. Co.,* No. 02–CV–6390, 2005 WL 711678, at *5 (E.D.N.Y. 2005). New York state courts, on the other hand, do recognize instances "where credibility is properly determined as a matter of law[.]" *Rickert v. Travelers Ins. Co.,* 159 A.D.2d 758, 759, 551 N.Y.S.2d 985 (3d Dep't 1990). Lloyds relies on this line of cases. Yet, even in those cases in which New York courts have granted summary judgment based upon false statements made by an insured, documentary evidence conclusively established that the statements at issue were in fact fraudulent when made, see *Carlin v. Crum & Forster Insurance Company,* 191 A.D.2d 373, 595 N.Y.S.2d 420 (1st Dep't 1993), or the insured's repeated failures of recollection were wholly incredible on their face, *Rickert,* 159 A.D.2d at 759–60, 551 N.Y.S.2d 985. Spiegel's statements, even if suspicious, do not fit that bill. Indeed, although Spiegel has not adequately explained why he did *affirmatively* state originally that the gold purchase money came from accounts receivable, it is also not at all clear why Spiegel would have intentionally lied or attempted to conceal the Mosexpo transaction from Lloyds during the EUO had he recalled it. There is no indication, for instance, that doing so would have bolstered or inflated Eurospark's claim, nor any evidence before the Court that Spiegel actually had something to hide in his dealings with Mosexpo.[8] Even more consequentially, contemporaneous documentation in the record does show that the gold purchase was made for Mosexpo and was to be paid via wire transfer from a party other than Eurospark. Drawing all inferences, as the Court must, favorable to Eurospark, there is a material fact in dispute regarding Lloyds' defense; a fact finder, with the opportunity to judge Spiegel's credibility in person, must determine whether his statements did result from

---

7. Although it is not determinative of the motion, the Court observes that the R & R correctly found that the contested provision in the Lloyds policy specifically voided coverage only if the insured submitted a false *claim* and did not include "false swearing" per se. However, case law suggests that fraud as an affirmative defense under New York insurance law includes false swearing on a material issue. *See, e.g., Varda,* 45 F.3d at 639. Further, false swearing can also constitute a breach of a policy's cooperation clause more generally. *See, e.g., 525 Fulton St. Holding Corp. v. Mission Nat'l Ins. Co.,* 610 F.Supp. 72, 73–74 (S.D.N.Y.1985); *Lenhard v. Genesee Patrons Co-op. Ins. Co.,* 31 A.D.3d 831, 833, 818 N.Y.S.2d 644, 2006 N.Y. Slip Op. 05259 (3d Dep't 2006). In any event, Judge Azrack has correctly concluded that, regardless of

what provision or whether Lloyds must prove that Eurospark made a false claim in order to disclaim coverage or can also do so by proving that Eurospark falsely swore on a material issue, Lloyds has failed to carry its burden of showing that Spiegel intentionally lied as a matter of law and, thus, its motion resting on fraud must be denied.

8. Lloyds claims that both of Spiegel's explanations of the April 1997 transaction are "probably false in order to obscure major deficiencies in Eurospark's record keeping or to camouflage more nefarious dealing with Mosexpo." This is, at best, a theory of Lloyds' case to be presented to the jury. The use of the expression "probably false" is damning in and of itself.

confusion, misunderstanding, and/or failure to recall as opposed to simple intentional false swearing.

Accordingly, upon *de novo* review, the Court denies Lloyds' motion for summary judgment based upon its claim that Spiegel testified falsely as to a material issue with intent to defraud.[9]

## II. Lloyds' Motion Based Upon Eurospark's Alleged Breach of the "Books and Records" Clause

■ Another provision of the Lloyds policy requires that "[t]he Assured will maintain a detailed and itemized inventory of his or their property, including records of purchases and sales and separate listings of all travelers' stocks, in such manner that the exact amount of loss can be accurately determined therefrom by the Underwriters." It is Lloyds' position that Eurospark breached this provision when it failed to record the Mosexpo order and the release of 3000 FTO of gold from the factory to Mosexpo.

■ Record-keeping provisions such as the one in the Lloyds policy should, according to New York law, be liberally construed "where there is evident merit in the claim, and the insured has made a *bona fide* effort to comply with the provisions of the policy in keeping honest books and accounts, however crude and unscientific they may be[.]" *6247 Atlas Corp. v. Marine Ins. Co., Ltd.,* 923 F.Supp. 523, 527 (S.D.N.Y.1996) (quoting *Garten v. Gen. Accident Fire & Life Assur. Corp.,* 206 A.D. 154, 157, 200 N.Y.S. 546 (4th Dep't 1923)). Such provisions "will be given such reasonable interpretation as will protect the insurer against fraudulent and excessive claims." *Garten,* 206 A.D. at 157, 200 N.Y.S. 546. Whether an insured has substantially complied with the books and records provision of an insurance policy is normally a question of fact for the jury. *Accord A.B.N. Jewelry, Inc. v. Am. Alliance Ins. Co.,* 242 A.D.2d 457, 662 N.Y.S.2d 254 (1st Dep't 1997). Applying this "substantial compliance" rule, the R & R finds that a jury could conclude that the omission of portions of the April 1997 transaction from Eurospark's books and records was immaterial to the claim for stolen gold and could be explained through Spiegel's testimony.

Lloyds' objection advances the argument that Eurospark's failure to record the 1997 transaction constituted a failure by Eurospark to make a *bona fide* effort to comply with the record-keeping provisions of the policy. Lloyds contends, specifically, that to determine the exact amount of loss under a valid roll-forward calculation, all "gold in" and "gold out" transactions between January 1, 1997 and March 14, 1998 would have to have been accurately recorded—yet, based on Spiegel's own testimony, there was no record of the Mosexpo "gold out" transaction of 3000 FTO. It is the position of Lloyds' expert accountant, Warren Johnson, that this alleged movement of 3000 FTO of gold with no record makes it impossible to accurately deter-

---

**9.** The parties also dispute whether any misrepresentations about the Mosexpo transaction were material to Lloyds' investigation as it was then proceeding. *See Fine v. Bellefonte Underwriters Ins. Co.,* 725 F.2d 179, 183 (2d Cir.1984) ("The materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding."). Like credibility, whether a misrepresentation is sufficiently material to void the policy is generally a question of fact for a jury to determine. *See Lenhard,* 31 A.D.3d at 833, 818 N.Y.S.2d 644, 2006 N.Y. Slip Op. 05259. Even if the Court were to assume *arguendo* that Spiegel's misrepresentations were material, however, Lloyds' motion must still be denied because issues of fact as to his credibility remain.

mine the amount of gold at the factory as of the date of the robbery. Lloyds further objects to the R & R insofar as it found: that fraud is an element of the "books and records" defense; that any gap in the books and records as to the 1997 transaction can be cured by Spiegel's recollection; and that an affidavit submitted by Eurospark's expert, Bourget, created an issue of fact.

Drawing all inferences in favor of Eurospark, the Court holds that Lloyds has not satisfied its burden of showing that Eurospark breached the "books and records" clause as a matter of law. First, this case is largely distinguishable from those where insureds were generally unable to produce any meaningful records to support their claims and, consequently, where insurers were forced to rely almost solely on self-serving statements of the insureds in order to determine the amount of loss. *See, e.g., Globe Jewelry, Inc. v. Pennsylvania Ins. Co.,* 72 Misc.2d 563, 564, 340 N.Y.S.2d 295 (1973); *Harris v. Gen. Accident, Fire and Life Assur. Corp.,* 187 N.Y.S. 291, 293 (1921); *Garten,* 206 A.D. at 157, 200 N.Y.S. 546. Here, by contrast, not only did Eurospark maintain a number of detailed records that were relied upon in the roll-forward calculation,[10] but the relevance and extent of the omission of the Mosexpo transaction from those records is very much in dispute. Eurospark has offered admissible proof through its expert, Bourget, that the absence of these records (a) is attributable entirely to the fact that Mosexpo, not Eurospark, paid Fleet directly for the gold, and, far more importantly, (b) that there are records that do reflect that the gold was for Mosexpo, that payment was to be made by a third party, and that the transaction reduced the con-

signment balance by 3000 FTO. Eurospark does, however, acknowledge a missing piece—a record of Mosexpo's removal of the 3000 FTO of gold from Eurospark's factory. But, the Court is very mindful that this "gap" did not inflate the size of Eurospark's claim. Thus, viewing this record as a whole and under any liberal construction of the "books and records" obligation, the issue of whether Eurospark "substantially complied" with its obligations here is clearly a matter for the jury and not for the Court to determine as a matter of law.

Lloyds' remaining general objections to the R & R are without merit. First, the R & R does not state that fraud is an element of the "books and records" defense, but simply rejects Lloyds' claim that the omission *was* fraudulent or constituted a failure to make a *bona fide* effort as a matter of law. Proof of fraud on this defense is not Lloyds' burden; Lloyds, of course, is still entitled to offer proof of fraud on the part of Eurospark, for indications of fraud will necessarily be relevant in construing such provisions to protect against false and excessive claims. *See, e.g., 6247 Atlas Corp.,* 923 F.Supp. at 527; *Licht v. New York Indem. Co.,* 250 N.Y. 211, 214, 164 N.E. 910 (1928). Second, the R & R does not hold that Spiegel's recollection can cure any gap in Eurospark's records. Rather, the R & R correctly notes that the law allows for "explanation and even supplement by oral statement" where there have been reasonable attempts at compliance, *Licht,* 250 N.Y. at 214, 164 N.E. 910, which, in any event, is a jury question. Finally, the Court disagrees with Lloyds' characterization of the Bourget affidavit as nothing more than a

---

**10.** Those records, according to Eurospark's expert, included Eurospark's general ledger, purchase journals, sales ledgers, monthly gold consignment account statements, consign- ment transactions documents, account payable files, vendor/contractor files, customer files and source documents for shipments and receipts.

"smokescreen" that cannot create an issue of fact. Quite the opposite. The affidavits of the experts for both sides establish manifestly that there is a material dispute as to whether there was substantial compliance with the record-keeping terms of the policy, *i.e.*, that Lloyds did or did not have sufficient records to accurately determine the exact amount of the loss.

Accordingly, the Court agrees with Judge Arrack's recommendation, and, upon *de novo* review, denies Lloyds' motion for summary judgment based upon the alleged breach by Eurospark of the books and records clause of its policy.

### III. Lloyds' Motion To Strike Eurospark's Claim for Labor

■ The final branch of Lloyds' motion challenges Eurospark's claim for nearly $1 million in the value of labor allegedly lost in stolen gold that was either finished jewelry or work-in-process. A clear cut defense, Lloyds contends that the value added of labor was just not covered under the policy it issued.

Two provisions of the policy are relevant here. The first is General Conditions 9(A), which provides:

The Underwriters shall not be liable beyond the actual cash value of the property at the time of any loss or damage and the loss or damage shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed the lowest figure put upon such property in the Assured's inventories, stock books, stock papers or lists existing at the time the loss or damage occurred, nor the cost to repair or replace the same with material of like kind and quality. Any antiquarian or historical value attaching to the said property shall be excluded from the estimate of loss or damage.

The other is the "Loss Settlement Clause", which provides:

Notwithstanding anything contained in General Conditions 9(A) of the Certificate to the contrary, it is understood and agreed that losses, if any of the Assured's own stock will be adjusted on the basis of the London Bullion Brokers 2nd fixing price per ounce as of the date of loss or if the date of loss is not a business day then the first business day after the loss.

Lloyds argues that the term "stock" in the Loss Settlement Clause includes all gold in Eurospark's possession—raw, work-in-process, and finished goods (chains and jewelry), and that all are valued on the basis of the 2nd London Fix price. As a result, Lloyds contends that the value of any labor that Eurospark added to gold in the manufacturing process was not covered. Eurospark objects on the ground that that the term "stock" is ambiguous and undefined in the policy and that New York law requires any such ambiguity be construed against the insurer. Eurospark counters, moreover, that the term "stock" in the Loss Settlement Clause should be read as referring only to raw gold; the proper valuation for finished or semi-finished stock, it argues, is "Actual Cash Value" (which would include coverage for value added as a result of labor).

■ Eurospark correctly articulates the chore before the Court. "The starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous." *Hartford Fire Ins. v. Mitlof,* 208 F.Supp.2d 407, 412 (S.D.N.Y.2002) (internal citations and quotation marks omitted). Ambiguities in an insurance policy certainly are to be construed against the insurer, particularly when the language at issue is in an exclusionary clause or purports to limit the insurer's liability. *See Breed v. Ins. Co. of North America,* 46

N.Y.2d 351, 353, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Indeed, the insurer "must establish that the words and expressions used (in the insurance policy) not only are susceptible of the construction sought by (the insurer) but that it is the only construction which may fairly be placed on them.... The insurer is obliged to show (1) that it would be unreasonable for the average man reading the policy to (construe it as the insured does) and (2) that its own construction was the only one that fairly could be placed on the policy." *Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 249 F.Supp.2d 303, 319 (S.D.N.Y.2003) (internal citations and quotation marks omitted).

Though the Court agrees with Eurospark's statement of the question, it agrees with Lloyds' answer to it. The term "stock" as used in the policy is unambiguous and clearly includes gold possessed by Eurospark in all of its forms. Numerous provisions in the policy belie Eurospark's contention that the term "stock" refers only to the raw gold. Section 1 of the insurance certificate identified covered property as follows: "A) Stock (including other people's goods); B) Money in Locked Safe at the Assured's premises; C) Patterns, Moulds and Dies at the Assured's premises; D) Furniture, Fixtures, Machinery, Tools and Fittings at the Assured's premises; E) Assured's interest (as tenant under a lease or other rental agreement) in Improvements and Betterments to premises."[11] There is no doubt that the stolen items here were all clearly part of "A) Stock ...." Indeed, the term "Stock" under A) is more specifically described in the certificate to include: "Pearls, precious and semi-precious stones, jewels, jewelry, watches and watch movements, gold, silver, platinum, other precious metals, and alloys and other stock usual to the conduct of the Assured's business[.]" Furthermore, in the Jewellers Block Policy Proposal Form Eurospark sent to Lloyds, it noted under the heading "Nature of Stock As Per Last Stock Inventory" that 100% of his stock constituted "gold, gold bullion, chains, gold wire." Based on all of these provisions, it is clear that raw gold, work-in-process, and finished products are all subsumed within the term "stock". Given the plain language of the policy, it is unnecessary to consider Eurospark's offering that there is an "industry-specific" meaning of "stock" which is separate from "semi-finished stock" or "finished stock", as there is no ambiguous term to construe.[12]

Additionally, the Court is fully in accord with Judge Azrack's determination that the Loss Settlement Clause of the policy issued by Lloyds provides the exclusive method for adjusting the loss of Eurospark's "stock" and that it does not include any provision for the value of labor. In clear words with powerful meaning, the clause unambiguously states that, *notwithstanding* anything to the contrary in the general provision limiting the insurer's liability to actual cash value, losses of the "Assured's own stock" are be adjusted on the basis of the 2nd London Fix. "Notwithstanding" means exactly that. *See Premier Car Rental, Inc. v. Gov't Emps. Ins.*

---

**11.** Eurospark did not purchase insurance coverage for either D) or E).

**12.** Surely, the fact that the Mass. Bay policy contains the term "finished stock" is irrelevant to the use of the term "stock" in the Lloyds policy. Regardless, even if the term "finished stock" may also be used within the industry, the more generic term "stock" in the Lloyds policy clearly incorporates all types of gold in whatever state (raw, semi-finished, or finished) and regardless whatever other expressions may also be appropriately used in the industry to describe various subcategories of "stock".

*Co.*, 223 A.D.2d 629, 631, 637 N.Y.S.2d 177, 178–79 (2d Dep't 1996) (noting that "notwithstanding" means "without prevention or obstruction from or by; in spite of") (citing Webster's Third New International Dictionary 1545 (3d ed.1961)). As a result, although the loss of other "non-stock" property insured under the policy may be determined by actual cash value in line with General Conditions 9(A),[13] the Loss Settlement Clause provides the exclusive method for adjusting any loss of Eurospark's gold in any and all of its forms. With all of its precision, this clause does not mention much less provide additional loss coverage for labor or other value that Eurospark may have added to the gold.

Finally, even assuming *arguendo* that there was ambiguity in the Loss Settlement Clause, Eurospark has submitted no evidence that would create a material issue about whether this clause was in any way intended to incorporate the value of labor added to the gold. Indeed, in deposition testimony cited by Eurospark here, the Lloyds' underwriter for the policy specifically stated that the Loss Settlement Clause valued the property only according to the weight of the gold multiplied by the 2nd London Fix price. (*See* Deposition of Simon Wilmot Smith, dated June 26, 2002, at 174–176). Further, the underwriter noted that in some cases, for instance involving the setting of diamonds into certain high-end gold jewelry, labor costs might be specifically insured, and, ordinarily, in a loss settlement clause that would have been written differently to include a pre-agreed percentage for labor accompanied by an upwardly adjusted pre-

mium. (*Id.* at 193–94). With respect to practices relating to insuring against jewelry industry losses, Eurospark offers no evidence to the contrary. In fact, the only insurance industry argument Eurospark makes is its cite to a statement Eurospark made relating to the "Bookkeeping" section of the policy proposal regarding Eurospark's records. Eurospark informed Lloyds that its records were "based on purchase and sale of gold and inventory by weight plus labor." This statement about Eurospark's records, of course, does not demonstrate even an intent or request on the part of Eurospark that labor was to be insured—let alone show the intent and understanding of both parties that it was. Simply put, Eurospark has failed to show that there is any ambiguity whatsoever in the valuation method explicitly set forth in the Loss Settlement Clause either by the words of the clause or any evidence extrinsic to it.

Accordingly, it is clear to the Court that Lloyds has carried its burden of showing that there is no material issue in dispute with respect to the construction of the policy. It would be unreasonable to construe the provision as Eurospark does, and the construction advanced by Lloyds is the only one that can fairly be placed upon the policy. *See Am. Nat'l Fire*, 249 F.Supp.2d at 319. For all of these reasons and those stated by Judge Azrack in her R & R, the Court grants upon *de novo* review partial summary judgment to Lloyds dismissing Eurospark's claim for the loss of the value added to raw gold by its labor as repre-

**13.** Other property insured which would presumably be valued at "Actual Cash Value" includes money in the locked safe, patterns, moulds and die s, and anything that is not the Assured's "own stock." The reference to the Assured's "own" stock in the Loss Settlement Clause presumably refers to the fact that the property insured may also include property entrusted to Eurospark by others under specified conditions in the policy. Any difference between Eurospark's "own stock" and stock entrusted to it, however, is not before the Court on this motion.

sented in the actual value of finished and work-in-process goods.[14]

### IV. Mass. Bay's Motion Based Upon Lost Business Income Coverage

The Mass. Bay policy insures for the loss of business income sustained by Eurospark "due to the necessary suspension of [its] 'operations' during the 'period of restoration'" following an otherwise covered loss. The period of restoration was to begin, according to the policy, with the date of the physical loss and to end on the date "when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality." The policy specifically excluded, however, coverage for losses resulting from damage or destruction of "finished stock" or the time required to reproduce "finished stock"—defined under the policy as "stock you have manufactured." Mass. Bay moved for summary judgment on the ground that the policy did not cover loss or theft of stock, nor the time required to reproduce "finished stock". Mass. Bay also grounded its disclaimer on the argument that the period of restoration covered by the policy was the period of time required by Eurospark to obtain gold on the open market and that that period here would be one day (resulting in no loss of business income). Finally, Mass. Bay argued that, even assuming that there was coverage as claimed by Eurospark, Eurospark could not calculate how much of its gold was work-in-process or finished product and, consequently, could not prove its claim.

Judge Azrack held that Mass. Bay failed in its burden on the motion. Contrary to the insurer's contention, "stock", she found, was not excluded from the policy for coverage of business income lost and extra expense incurred. Judge Azrack, however, did concur with Mass. Bay that "finished stock" was excluded and that raw gold would also be excluded practically because the "period of restoration" for raw gold is nil. Judge Azrack even accepted the notion that many of Eurospark's records might be too vague to allow a fact finder to distinguish work-in-process from raw gold or finished product. Nonetheless, drawing all inferences in a manner favorable to Eurospark, she concluded that the robbery of the Eurospark gold did have *some* negative impact on its business such that there was a "period of restoration". Further, she observed that there was at least a material issue as to whether Eurospark suffered an "extra expense"— interest Eurospark paid on a loan given by Fleet Bank immediately after the robbery, which, apparently, was made necessary by the robbery. Given all of that, Judge Azrack recommended that this Court deny Mass. Bay's motion for summary judgment. The Court has thoroughly reviewed not only the R & R as to Mass. Bay's motion, to which no party has objected, but the record as well. None of the recommendations regarding the Mass. Bay motion are clearly erroneous, and thus they are adopted in full.

### Conclusion

Upon *de novo* review of the entire record, the Court finds the report and recommendation filed by Magistrate Judge Azrack is comprehensive and exhaustive on the law, which it has clearly and correctly applied to the admissible evidence submitted by the parties. The report and recommendation, therefore, is adopted in full without modification. Consequently, Lloyds' motion for summary judgment is granted solely with respect to that portion

---

**14.** The Court need not address, therefore, Lloyds' contention that Eurospark's records do not provide a sufficient basis to calculate the value of the labor.

denying coverage for labor but is otherwise denied. As to that claim against Lloyds for the value of labor, Eurospark's complaint is dismissed. Mass. Bay's motion for summary judgment is denied in its entirety.

The parties are directed to contact Magistrate Judge Azrack to arrange for a pretrial conference at which time an order will be entered directing the prompt filing of a final joint pretrial order.

SO ORDERED.

## REPORT AND RECOMMENDATION

AZRACK, United States Magistrate Judge.

All that glitters or glisters is not gold. *The New Dictionary of Cultural Literacy* (3d ed.2002) (attributed to Morocco in Shakespeare's, The Merchant of Venice). In this case at least some of it is. In a sentence, two insurance companies do not want to pay claims on policies issued to a Long Island City jewelry maker, the plaintiff, whose gold was stolen in a robbery, because: (1) the jewelry maker's principal, Michael Spiegel, was less than entirely forthright concerning an unusual and relatively large gold transaction; (2) the jewelry maker, now bankrupt, has not produced, according to the insurers, records adequate to determine precisely what was taken; and (3) the losses claimed are not covered or are otherwise specifically excluded from coverage. New York law governs the case which has its origins in adversary proceedings filed in the bankruptcy court: turnover claims against both insurers for the benefit of Eurospark's creditors and a claim, in an amended complaint, against Lloyds for breach of the covenant of good faith and fair dealing, which claim the Bankruptcy Court has dismissed on motion. *In Re Eurospark Industries, Inc.,* 288 B.R. 177 (Bankr. E.D.N.Y.2003). The matter is before the Court on the defendants' motions for summary judgment.[1]

Lloyds issued the primary policy, referred to as a jeweler's block policy, for theft coverage from October 24, 1997 to October 24, 1998 for one million dollars ($1,000,000).[2] Other Lloyds Syndicates issued an excess policy for five million five hundred thousand dollars ($5,500,000) for the same time period and with the same terms and conditions. Lloyds Notice of Motion (doc. # 55–2) Exh. 2 ("Lloyds Exh."). Massachusetts Bay ("Mass. Bay") issued a policy for one million dollars ($1,000,000) for business income loss insurance from November 24, 1997 to November 24, 1998 subject to eighty percent (80%) co-insurance and a deductible of one thousand dollars ($1,000). Friedman Aff. Exh. 1 (doc. # 37).[3]

---

1. No portion of the parties' submissions concerning whether Spiegel staged the robbery or is otherwise involved in or responsible for it, whether by act of commission or omission, nor any material concerning Eurospark's disposal of cyanide waste has been considered in determining these motions. Memorandum of Law in Opposition, etc. at 31–34 (doc. # 81). The moving papers do not place those issues before the Court on these motions. Doc. # 38 (Mass. Bay Memorandum of Law at 2–3) (setting forth the points raised in support of summary judgment); doc. # 55 pt. 3 (Lloyds Memorandum of Law at 6–7 (same)).

2. For a discussion of the origins of and reason for these policies see 68A N.Y.Jur.2d *Insurance* § 555 and Tracey A. Bateman, Annotation, *Construction and effect of "jeweler's block" policies or provisions contained therein,* 22 A.L.R.5th 579 § 2 (1994). Despite an apt title, apart from an explanation of why these policies exist, the annotation is not relevant to the issues presented in these motions.

3. The exhibit which contains the business interruption policy also contains copies of other insurance policies which Mass. Bay issued to Eurospark. The terms of and explanation of the operation of the co-insurance are set forth

Unfortunately, at the Long Island City manufacturing facility on March 14, 1998 unknown individuals robbed plaintiff's employees of gold at gunpoint. Thereafter, as a result of this robbery, in May 1998 plaintiff filed a claim with Lloyds for a loss in excess of four million dollars for ten thousand six hundred forty-three (10,643) troy ounces of gold plus $959,109 for labor. Lloyds Exh. 7. Plaintiff filed a separate claim in June 1998 with Massachusetts Bay for lost business income in the amount of $1,575,246.16. Doc. # 37 Exh. 2 (proof of loss submitted to Mass. Bay). Based on its own expert's report, that amount, consistent with the 80% coinsurance provision, has been reduced to a total of $1,022,696 ($933,166 for lost income plus $89,530 covered extra expense), which exceeds the policy's limits. Filing for Chapter 11 protection followed in August 1998, and the adversary proceedings came first against Mass. Bay in September 1998 and then against Lloyds in October 1998. Lloyds Exh. 3.

### 1. Lloyds claim that Spiegel's false swearing voids the policy.

The policies are subject to a disclaimer:

21. If the assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this insurance shall become void and all claim hereunder shall be forfeited.

Lloyds Exh. 1. They also contain a cooperation clause (¶ 14) which allows the underwriters to subject the insured to an examination under oath with respect to a claim. As might be expected, among other witnesses, Eurospark's principal, Spiegel, provided testimony pursuant to this clause as well as in a reply affidavit in support of a motion for summary judgment, which motion the Bankruptcy Court denied, Lloyds Exh. 6, a deposition pursuant to Fed.

R.Bankr.P. 7030, which applies Fed. R.Civ.P. 30 to adversary proceedings, and responses to interrogatories. According to Lloyds, the latter documents exposed the falsity of testimony given pursuant to the cooperation clause and thereby voided the policies. Lloyds' Memorandum of Law at 1 (doc. # 55).

Through Eurospark, Spiegel maintains a precious metals account at Fleet Bank which he uses to pay for gold held on consignment. At his examination under oath on September 8, 1998, Lloyds Exh. 8 (excerpts), Lloyds inquired about two transactions on this account, one for April 4, 1997 and another for April 3, 1997, each in the amount of 1500 fine troy ounces of gold for a total of $1,044,975. The transactions are reflected in confirmations from Fleet. Lloyds Exhs. 11 & 12.

Spiegel acknowledged the documents. Initially, he characterized the transactions as purchases and stated that he did not recall where the money had come from for the wire transfers. Later, when the examiner returned to the subject, Spiegel testified that he had paid down his consignment line with wire transfers because he had extra money from accounts receivable. When advised by the examiner that Eurospark's books and records had been examined and that they contained nothing which corresponded to these two transactions, Spiegel referred the insurer to BDO Seidman, his outside accountants. When advised that his bank statements for the month of April 1997, failed to reflect the transfer of this money, he stated that he had never examined his bank statements and that BDO Seidman was responsible for any reconciliation.

The examiner later turned the questioning to an entity called Mosexpo Moscow, which Spiegel acknowledged as one of his

in the business interruption policy's terms/language at 4.

customers, and then returned to the aforementioned Fleet transactions whereupon Spiegel reiterated that the source of the answers was the accountants. He then said that he had no idea why there had been two transactions. The examiner requested documents concerning the transaction and then, perhaps having been surprised by the answers, led Spiegel to reiterate that to the best of his recollection the money for these transactions had come from an accumulation of accounts receivable and "Q. Is there anything you could review or anybody that you can discuss these transactions with that would improve your recollection or give you the answers to the questions? A. Nobody except BDO Seidman." Lloyds Memorandum of Law at 11 (doc. # 55, part 3).

Lloyds points out that following this examination, Spiegel received the transcript and an errata page with the instruction to provide missing information/documentation and to make any necessary corrections. Spiegel executed the transcript and returned three (3) errata pages with corrections, none of which concerned his testimony about these transactions. Lloyds Exh. 13.

By the time that Eurospark filed a reply in response to the opposition to its motion for summary judgment in the bankruptcy court in February 1999, Spiegel's memory had improved. Lloyds Exh. 14 (excerpted); Mallin Aff. Exh. B. In early 1997 Mosexpo, an entity with which Eurospark had done business, placed an order which required 3,000 ounces of gold. Spiegel advised Mosexpo that Eurospark did not have the money to pay for that much gold, so Mosexpo agreed to pay Fleet directly for 3,000 ounces of gold consigned to Eurospark. The documents of April 3, and April 4, 1997 for 3,000 ounces of gold reflect the transaction. For reasons that have not been disclosed, Mosexpo canceled

its order for jewelry, but because Eurospark did not have more than a million dollars to pay for the gold, Mosexpo agreed to take the gold. In responses to interrogatories Eurospark identified Spiegel as the individual with knowledge of the transaction which had occurred orally by telephone. Spiegel answered that he did not remember the dates of Mosexpo's order nor the cancellation and that Eurospark had no documents which reflected these dates. Eurospark also had no documents which reflected the details of the order because it was never finalized. The gold, which was packaged in one kilogram bags of fine casting grain, found its way to Mosexpo through a messenger or intermediary, who picked it up from Eurospark's premises. Spiegel could not identify the messenger beyond being a man. Lloyds Exh. 15.

The efforts to explore the details and circumstances of this transaction at Spiegel's deposition primarily reflect the examiner's obvious astonishment and perhaps a refusal to believe that Spiegel had given more than a million dollars of gold to an individual, whom he could not identify, after having seen only a letter from Mosexpo, a copy of which Spiegel apparently had not made nor saved. Eurospark had also not generated any paperwork for this event and had not recorded it in its precious metals account.

According to Lloyds Spiegel lied when he said that the payment of $1,044,975 to Fleet, that is the two transactions of April 3 and April 4, 1997, had come from an excess of account receivables. Lloyds Memorandum of Law at 20 (doc. # 55).

At this point, a brief aside and observation becomes necessary because the parties, primarily the movant Lloyds, have relied heavily on cases which concern the voiding of fire insurance policies. N.Y. Ins. Law § 3404(e) specifically requires

the standard New York fire insurance policy to contain a concealment/fraud clause which states *verbatim* the following:

This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

By contrast the instant fraud clause voids the policy if the insured makes any claim knowing the same to be false or fraudulent, as regards amount or otherwise. The legislature's choice of wording indicates that "fraud or false swearing" are not necessarily one in the same but are equivalents for purposes of nullifying the coverage. To establish its affirmative defense Lloyds must demonstrate that Eurospark made its claim for insurance coverage knowing that the *claim* was false or fraudulent; mere false swearing by itself does not nullify the coverage. *See Christophersen v. Allstate Ins. Co.*, 34 A.D.3d 515, 516, 824 N.Y.S.2d 171, 172 (2d Dep't 2006); (unintentional fraud or false swearing or the statement of any opinion mistakenly held are not grounds for vitiating a policy); *Sunbright Fashions, Inc. v. Greater New York Mut. Ins. Co.*, 34 A.D.2d 235, 237, 310 N.Y.S.2d 760, 761 (1st Dep't 1970) (same) (theft insurance), *aff'd*, 28 N.Y.2d 563, 268 N.E.2d 323, 319 N.Y.S.2d 609 (1971).

In a case involving property damage by flood Judge Trager of this Court observed,

In New York, to void an insurance contract on the basis of fraud, an insurer must show the insured willfully made a false and material statement under oath with the intent to defraud the insurer. *See Fine v. Bellefonte Underwriters Ins.*, 758 F.2d 50, 52 (2d Cir.1985) ("[A]ccording to the law of New York, a false statement made on an examination

under oath must be both material and willful."); *Deitsch Textiles, Inc. v. N.Y. Prop. Ins.*, 62 N.Y.S.2d 999, 1001, 479 N.Y.S.2d 487, 488, 468 N.E.2d 669 (1984) (requiring intent to defraud be an element of the defense of fraud and misrepresentation.).

*Staten Island Supply Co., Inc. v. Lumbermens Mut. Cas. Co.*, No. 02–CV–6390 (DGT) (E.D.N.Y. Mar. 29, 2005) (2005 WL 711678 at *5). *Fine* involved a fire insurance policy with a § 3404(e) clause. *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 181 (2d Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984). *Deitsch Textiles* involved a fire insurance policy with the clause required by the predecessor to § 3404(e), N.Y. Ins. Law § 168 subd. 5. Accordingly, the differences in the wording of fraud clauses in insurance policies may be semantic as pertains to this case because the filing of a false claim, which Lloyds must establish here to prevail, is indisputably an act of insurance fraud. Additionally, because Lloyds seeks to vitiate the policy on the basis of fraud, it bears the burden of proving that Eurospark filed a false claim by clear and convincing evidence. *See Varda v. Insurance Co. Of North America*, 45 F.3d 634, 639 (2d Cir.1995); *Lenhard v. Genesee Patrons Co-Operative Ins. Co.*, 31 A.D.3d 831, 833, 818 N.Y.S.2d 644, 646 (3d Dep't 2006); *Ausch v. St. Paul Fire & Marine Ins. Co.*, 125 A.D.2d 43, 45, 511 N.Y.S.2d 919, 922 (2d Dep't 1987) *(mem.)*, *lv. denied*, 70 N.Y.2d 610, 516 N.E.2d 1223, 522 N.Y.S.2d 110 (1987).

In an affidavit in support of this motion Spiegel attributes his memory lapse to what amounts to a quick shuffle. He claims that during his examination under oath he referred the examiner to the accountants for answers to accounting questions and that he had employed two individuals on site who handled the day to day

books and records and had forwarded them to the accountants. After all, he is a jeweler and not an accountant. He could not recall what he refers to as the two isolated transactions because his involvement in them was limited and because he had employees and accountants handling them. When he was asked about Mosexpo, he answered the questions in the same manner he would have for any of his customers, and perhaps most tellingly, he observes that he was never asked any questions that related Mosexpo and the two Fleet April 1997 transactions.

In what appears to be a deviation from the rules relevant to Federal Civil Rule 56 summary judgment, in the context of fraudulent insurance claims the New York courts have reserved the right to determine the insured's credibility as a matter of law. Thus, in *Rickert v. Travelers Ins. Co.*, 159 A.D.2d 758, 551 N.Y.S.2d 985 (3d Dep't 1990), *lv. denied*, 76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990), where the insured sought recovery under a homeowner's policy for items taken in a burglary, the Appellate Division upheld the trial court's determination of the insured's credibility on summary judgment. The Appellate Division characterized as implausible the insured's self serving statements about having failed to recall other relatively recent claims and having remembered the theft of a diamond ring but having forgotten being paid for it. Where, however, an insured sought recovery for fire damage to the second floor of his home, which actually had been damaged by water in a prior event, the Appellate Division upheld the trial court's denial of summary judgment for the insurer because the insured's records from the prior event had been lost or discarded as a result of the fire and because the insured had not carefully reviewed the proof of loss. *Ingarra v. General Accident/PG Ins. Co. Of N.Y.*, 273 A.D.2d 766, 768, 710

N.Y.S.2d 168, 170 (3d Dep't 2000). On the federal side, an insured chef who failed to advise the insurer of income received from a contract during the alleged period of business interruption covered by loss of business income insurance survived summary judgment on a finding that the issue of the insured's intent should be submitted to a jury. *Admiral Indemnity Co. v. Bouley International Holding, LLC*, No. 02 Civ. 9696(HB) (S.D.N.Y. Nov.13, 2003) (2003 WL 22682273 at *4). The federal court did not mention the New York rule concerning the assessment of credibility.

Of course, this Court must follow the federal rule and thereby avoid an assessment of Spiegel's credibility. However, the gall apparent in his averments would permit a reasonable trier of fact to conclude that Lloyds has presented clear and convincing evidence that Spiegel lied at his examination under oath. The two deposits appear to be related to the largest order Eurospark ever had, but Spiegel conveniently forgot about it. No record of the order; no record of the telephone call; no record of the shipment; no evidence, apart from Spiegel's testimony, that a messenger or other intermediary picked up more than a million dollars worth of gold; no copy of the letter which Spiegel relied on to release the gold; the only records—two deposits which, by themselves do not evidence why they occurred; maybe something having to do with smuggling gold to hide the event from the Russian taxing authorities (Eurospark's Memorandum of Law in Opposition at 14 (doc. # 47)). Why refer the insurance examiner to the accountants for answers about two deposits when it appears that Spiegel and somebody at Mosexpo were the only people who knew the reason for those deposits. Spiegel had to have known that the accountants could not possibly have known about the Mosexpo order because it had never

been finalized and therefore never recorded. As Spiegel has presented the transaction, unless you were Spiegel or Mosexpo, you would not have known about it.[4] On the other hand, at least for purposes of a summary judgment motion, no matter how seemingly unlikely, the jury might actually believe Spiegel's explanation that during his examination under oath, the lack of context for transactions that were more than a year old would hardly have prompted him to remember their relationship to a specific unsuccessful, unrecorded and almost entirely undocumented order.

### 2. Lloyds claim that Eurospark's records are inadequate.

Significantly, having established Spiegel's falsehood, Lloyds maintains that it was relevant and material to its effort to verify the quantum of Eurospark's claim. Lloyds Memorandum of Law at 20 (doc. # 55); Lloyds Reply Memorandum of Law at 13 (doc. # 56 part 9). As noted in *Christophersen, supra,* " '[t]he issue of materiality is generally a question of fact for the jury [and] [c]onclusory statements by insurance company employees … are insufficient to establish materiality as a matter of law' (citations omitted)." 34 A.D.3d at 515, 824 N.Y.S.2d at 172. In this case the materiality of the falsehood relates directly to the issue of the insured's having complied with its books and records obligation under the policy, the second point Lloyds relies upon in support of its motion. Not unsurprisingly, the record discloses that the experts, forensic accountants, do not agree about whether Eurospark's records account for the Mosexpo transaction, and Lloyds' expert, having concluded that they do not, has obviously also concluded

that the failure to account properly for the 3000 ounces of gold allegedly involved in the Mosexpo transaction results in the inability of any accountant to determine the exact amount of the claim.

Because the policies insured against the theft of gold on the premises, they contain what Lloyds characterizes as a books and records obligation:

8. It is a condition of this insurance that:

A) The Assured will maintain a detailed and itemized inventory of his or their property, including records of purchases and sales and separate listings of all travelers' stocks, in such manner that the exact amount of loss can be accurately determined therefrom by the Underwriters.

Eurospark hired Paul Bourget & Associates, a forensic accountant, to tally up the losses. In an affidavit submitted in opposition to the instant motion, Mallin Aff. Exh. A (doc. # 47 pt. 6), Bourget explains that he verified the claim through a roll forward of both the in-house and off-premises gold balances for all transactions from January 1, 1997 to March 18, 1998, the date of the robbery. Bourget prepared his report, Mallin Aff. Exh. L at 5–9, from information in Eurospark's books and records, which consisted of its general ledger, purchase journals, sales ledgers, monthly gold consignment account statements, consignment transaction documents, account payable files, vendor/contractor files and source documents for shipments and receipts. Lloyds has no problem with the concept of a roll-forward calculation: start

---

4. Eurospark charges Lloyds with knowledge of the Mosexpo transaction it seems because Lloyds knew of Mosexpo as a customer. Knowledge that an entity is a customer of the insured is obviously not knowledge of a specific transaction. More significantly, Spiegel does not appear to have disclosed the order and its cancellation to anyone; as a result, how could Eurospark's accountants, its insurer or its insurer's attorneys have known about it?

from a date on which the quantity of gold on premises is known, add the gold in and subtract the gold out over the relevant time frame, and the result will be the gold lost.[5] Lloyds also has no problem with the relevant time frame of fourteen and one-half months, *i.e.*, a start date of January 1, 1997, which was necessary because Eurospark did not have a gold inventory for calendar 1997.

Lloyds' expert, Warren Johnson, also a forensic accountant, reviewed Eurospark's records. In a supplemental affidavit dated 1/30/06, doc. # 61, which may have been prompted by the results of Bourget's roll forward inventory affidavit and which reiterates the points he made in his original affidavit dated December 30, 2005, doc. # 56 pt. 9, Johnson states:

> 12. But for Spiegel's testimony, the Mosexpo scenario would not exist, it is not supported by Eurospark's books and records.

> 13. The alleged movement of 3000 FTO of gold out of Eurospark's possession during the inventory roll-forward period on an unspecified date, without any written notation of the gold leaving the premises, makes it impossible for your affiant or any other accountant to accurately determine the amount of gold on the premises on the date of the claim.

As an expert in accounting, Johnson may testify that Eurospark's books and records do not support the existence of the Mosexpo transaction. But he is in no better position than the trier of fact to determine whether other evidence, apart from Spiegel's testimony, permits an inference that the transaction occurred.

In response to Johnson's supplemental affidavit, Eurospark has offered more of Spiegel's testimony. Sur–Reply Affirma-

tion in Opposition, etc. (Mallin Aff. Exh. A) (doc. # 64) ("doc.# 64"). Comparable to his reply affidavit in opposition, Spiegel now explains the Mosexpo transaction in great detail, the details of which are only more forthcoming than what has already been related in one arguably key point. A translated letter to Mosexpo permits the inference that if there was an order for the gold and the order was canceled, it was canceled because changes in Russian tax laws made imports unprofitable. Doc. # 64 Exh. G.

Spiegel's main point, however, is that reference to more of the documents concerning the transaction, and not just Lloyds Exhs. 11 & 12, demonstrates, with his explanation, that Eurospark never actually paid for the gold at all. According to Spiegel, Eurospark sent memos to Fleet, doc. # 64 Exhs. C & D, for the purchases of 1500 ounces of gold. On the first "Transfer from Mosexpo directly to Fleet account" has been handwritten. The second bears a similar handwritten endorsement: "Transfer from Mosexpo for Orders." Spiegel next explains that the confirmations from Fleet, three pages each, doc. # 64 Exhs. E & F, bear text on the third page that discloses an incoming Fedwire transfer to Fleet through Chase Bank in New York. According to Spiegel, this routing of the money indicates that the funds originated from overseas. As a result, based on these documents, which were previously provided to Lloyds, Eurospark's books and records disclose no payment for the 3000 ounces of gold because Eurospark never paid for that gold. Thus, in the course of attempting to explain how the books and records reasonably should not reflect this transaction,

---

5. Although the submissions refer to the quantity of gold on premises, Bourget determined that amount, in part, by accounting for all of Eurospark's gold, including what was off premises, so as to determine what had been stolen from the premises during the robbery.

Spiegel indirectly has confirmed that he was not telling the truth when he was asked earlier about these gold purchases.

Apart from the obvious genuine issue of material fact which arises from the experts' disagreement, Lloyds' position is that Spiegel may not cure a gap or omission in Eurospark's records merely through his testimony and that Eurospark's having omitted the 3000 ounces from its insurance claim, again, consistent with his testimony, is not relevant. If the trier of fact believes Spiegel's testimony, now buoyed in part by the Fleet generated confirmations, the 3000 ounces of gold reflected in the deposits of April 3 and April 4, 1997 were never in the roll forward calculation prepared to substantiate the claim, a point emphasized by Bourget. Doc. # 64 Exh. B (Bourget Aff. ¶ 10). In the context of summary judgment the Court must draw the inference favorable to the opponent, Eurospark, and therefore must conclude that a trier of fact could find from the evidence that the concealment of the Mosexpo order was not consequential to determining the claim for stolen gold.[6]

Cases cited by Lloyds are distinguished by the scarcity of the records available for the insured to rely upon to establish its claim. The courts were unwilling to subject the insurer to the mercies of an insured with faulty recollection, or worse, motive to inflate a claim. *See, e.g., Michael K. Galleries, Ltd. v. St. Paul Fire & Marine Ins. Co.*, No. 87 Civ. 3769(KMW) (S.D.N.Y. Apr.13, 1989) (1989 WL 38125 at *2–*3) (citing cases). Arguably, almost every insured has motive to inflate a claim, but if Spiegel is found credible, the trier of fact may find that this case concerns the partial absence of one event from books

and records that Bourget, a forensic accountant, relied upon as adequate and used to calculate the loss by the roll forward method. On the other hand, if the trier of fact agrees with Johnson, Spiegel's memory lapse may result in an absence of coverage.

Sustaining Lloyds' position on the instant record in the context of summary judgment would also produce an unwarranted result. As the Court observed in *6247 Atlas Corp. v. Marine Ins. Co., Ltd.*, 923 F.Supp. 523, 527 (S.D.N.Y.), *aff'd*, 104 F.3d 352, 1996 WL 629720 (2d Cir.1996):

> Plaintiffs assert that New York courts have held that record-keeping provisions should be loosely construed. *See Mord v. New York Indem. Co.*, 216 A.D. 252, 214 N.Y.S. 693 (2d Dep't 1926). Indeed,
>
> > Where there is evident merit in the claim, and the insured has made a *bona fide* effort to comply with the provisions of the policy in keeping honest books and accounts, however crude and unscientific they may be, the courts will adopt a liberal interpretation of what constitutes books of account, to the end that the insurer will be helped to perform its contract.
>
> *Garten v. General Accident Fire & Life Assur. Corp.*, 206 A.D. 154, 200 N.Y.S. 546, 547 (4th Dep't 1923); *see also Mord*, 214 N.Y.S. at 696.

Eurospark purchased insurance to compensate it for loss from the theft of gold. In this case gold was taken. Obviously, Eurospark should not benefit from a gap in its books and records if there is one. As the court observed in *Saks & Co. v. Continental Ins. Co.*, 23 N.Y.2d 161, 295 N.Y.S.2d 668, 242 N.E.2d 833 (1968), however, that gap supports a conclusion of

---

**6.** The trier of fact's actual reaction, of course, remains to be seen. As laypersons presumably to both the law and the gold trade, they are unlikely to view the failure to remember a million dollar transaction as a small or insignificant discrepancy.

fraud if there is a gross disparity between the amount claimed and the amount actually proved and the explanation tendered is so unreasonable or fantastic that it is inescapable that fraud has occurred. *Id.* at 165–166, 295 N.Y.S.2d at 672, 242 N.E.2d 833. Here Lloyds' expert, Johnson, does not state that no method exists to determine a minimum amount of gold that had to have been taken, a number that is, for example, the amount of gold that at least had to have been on the premises at the time of the robbery. *See Wagner v. Federal Emergency Management Agency*, No. CV–86–1153 (E.D.N.Y. Mar.30, 1989) (1989 WL 32803 at *2–*3) (after a bench trial the court awarded damages premised on the loss established by the insured's records). Nor has Lloyds offered a good reason why summary judgment should be granted so that the victim of a theft of insured property will not be compensated for some of the insured property that was stolen merely because he cannot account completely for all of the insured property that he reasonably believes was stolen.

### 3. Lloyds claim that labor is not insured.

Lloyds' third and final basis for its motion relies on the Loss Settlement Clause:

> Notwithstanding anything contained in General Conditions 9(A) of the Certificate to the contrary, it is understood and agreed that losses, if any of the Assured's own stock will be adjusted on the basis of the London Bullion Brokers 2nd fixing price per ounce as of the date of loss or if the date of loss is not a business day then the first business day after the loss.

According to Lloyds, this language did not insure Eurospark for the cost of labor lost in stolen gold that was finished or partially finished. Eurospark's response assumes that uncertainty or ambiguity arises from the absence of a clause or term which defines "stock." *Memorandum of Law in Opposition, etc.* at 18–19, 21 (doc. # 47 pt. 4).[7]

The policy's reference to "stock" does not subsume labor into the coverage merely because Eurospark may have added the value of the labor to the gold as it proceeded from step to step in the processing that results in finished chains and jewelry. In mercantile law "stock" is the goods or chattels which a tradesman holds for sale or traffic. *Spring Garden Ins. Co. Of Philadelphia v. Brown*, 143 S.W. 292 (Tex. Civ.App.1911). In an old New York case, *Gates v. McKee*, 13 N.Y. 232, 64 Am. Dec. 545 (1855), the suit by Gates against Chauncey McKee, as guarantor, concerned a guarantee, a contract similar to an insurance policy, which read, "Mr. Gates—Sir: I will be responsible for what stock M.E. McKee[, a tanner, currier and dealer in leather and stock for the shoemaking business,] had or may want hereafter to the amount of five hundred dollars." In construing the guarantee's language, the New York Court of Appeals observed that, "... the word 'stock' alone denotes the supply of materials for the business of the party spoken of." 13 N.Y. at 234. Labor is not a supply of materials.

Assuming *arguendo* that "stock" somehow includes labor, that labor is subject to adjustment on the basis of the London Bullion Brokers 2nd fixing price per ounce as of the date of loss. A description of how this price is set appears in City Business Services, Bullion Markets at 4 (Dec.

---

7. For a discussion of the principles employed by courts to determine if insurance policy language is ambiguous see 1 Insurance Claims and Disputes 4th § 6:2 (available on Westlaw).

2006), a publication of International Financial Services London, available at www.ifsl.org.uk.uploads/CBS_Bullion_Markets_2006.pdf. Obviously, that adjustment cannot be made for labor, even if Eurospark's records concerning labor were in pristine condition, a point very much in dispute. In this contract, use of the term "stock" in a specific context has defined or limited it sufficiently to mean that the policy does not cover the loss of labor.

Eurospark also refers to General Condition 9A, which limits the insurer's liability to

> the actual cash value of the property at the time of any loss or damage and the loss or damage shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed the lowest figure put upon such property in the Assured's inventories, stock books, stock papers or lists existing at the time the loss or damage occurred, nor the cost to repair or replace the same with material of like kind and quality.

Lloyds Exh. 1. "New York courts have adopted a broad evidence test to determine the actual cash value of property; it is generally held that the court may examine any factor which is relevant to estimating loss." *Great Northern Ins. Co. v. Dayco Corp.*, 637 F.Supp. 765, 781 (S.D.N.Y. 1986) (citations omitted); *accord SR International Business Ins. Co. Ltd. v. World Trade Center Properties, LLC*, 445 F.Supp.2d 320, 342 (S.D.N.Y.2006) (broad evidence rule is a default for a policy which contains no definition of "actual cash value"). Even if Eurospark were to persuade a trier of fact that labor was relevant to determining the actual cash value of the stolen gold, it fails to explain how this clause supports its claim.

In construing and applying statutory language, courts have understood the term "notwithstanding" to mean without prevention or obstruction for or by or in spite of. *E.g., King v. Sununu,* 126 N.H. 302, 306, 490 A.2d 796, 800 (1985); *Premier Car Rental, Inc. v. Government Employees Ins. Co.,* 223 A.D.2d 629, 630–631, 637 N.Y.S.2d 177, 178–179 (2d Dep't 1996) (*mem.*); *Commonwealth v. Sanchez–Rodriguez,* 814 A.2d 1234, 1238 (Pa.Super.2003); Black's Law Dictionary at 1094 (8th ed.2004). Accordingly, the instant insurance policy's use of "notwithstanding" in the loss settlement clause indicates that this clause takes precedence over anything contained in General Conditions 9A. The policy contemplates that the insured must first satisfy the loss settlement clause, following which, the insurer may invoke the limitation of liability set forth in General Conditions 9A.

As the Court has concluded that the insured's claim for labor does not qualify for coverage under the loss settlement clause, Eurospark's arguments concerning general conditions 9A need not be addressed, and the parties' dispute concerning whether Eurospark's books and records adequately substantiate its claim for labor also need not be addressed.

### 4. The Mass. Bay motion

Lloyds has sought to deprive its customer of any coverage for the gold taken because the customer may not be able to document all of the gold that was taken. In a similar theme, Mass. Bay seeks to deprive the same customer of any business income interruption coverage because the customer cannot pinpoint precisely the end of the period of restoration, essentially the date on which business is back to normal and therefore the insurer stops paying for the loss of income.

The Mass. Bay policy sets forth its coverage essentially in a single sentence: "We

will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'" Doc. # 37 Exh. 1. The policy defines "Business Income" as, "a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and b. Continuing normal operating expenses incurred, including payroll." *Id.* Section G, DEFINITIONS, sets forth the time frame for computing the period of restoration:

> 3. "Period of Restoration" means the period of time that:
>
> a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and
>
> b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

*Id.* at 6. The use of the word "should" in the definition means that the period is defined in theoretical terms. *See SR International Business Ins. Co., Ltd. v. World Trade Center Properties, LLC.*, No. 01 Civ. 9291(MBM) (S.D.N.Y. Feb.15, 2005) (2005 WL 827074 at *4) (citing cases). The business income policy specifically excludes "[a]ny loss caused by or resulting from: (a) Damage or destruction of 'finished stock'; or (b) The time required to reproduce 'finished stock.'" [8] In the definitions, " 'Finished Stock' means stock you have manufactured." [9]

Faced with this language, Spiegel has provided a lengthy recitation of the processing steps which eventually result in the gold chain that comprised seventy percent (70%) of Eurospark's business. Doc. # 56 pt. 7 (Spiegel Aff. 8/25/05 ¶ 10); *see* Memorandum of Law in Opposition, etc. at 5–8 (doc. # 81) ("doc. # 81"). Spiegel states that it takes forty-two (42) hours to produce 1000 grams of 14 carat gold chain and about twelve percent (12%) longer or forty-seven (47) hours to produce the same amount of 10 carat gold chain. By comparing these observations to the total grams of gold stolen, 301,724, he approximates that 12–17 months would be necessary to reproduce Eurospark's inventory at the time of the loss. *Id.* ¶ 11. He further explains that the goods were never "finished" until, in response to an order, the chains, kept on spools, were cut to the appropriate length and fitted with a clasp. *Id.* ¶ 21. Probably in reliance on Spiegel's estimate, Bourget calculated the loss of income to Eurospark for a one year period of restoration. He has submitted no evidence which demonstrates that he has determined independently what the theoretical period of restoration should be to restore Eurospark's pre-robbery inventory based on his examination of Eurospark's books and records in conjunction with the policy's definition.

■ Eurospark would have had raw gold, work in process, and finished product on the premises at the time of the robbery, although, as noted, Spiegel asserts that the chains are not actually finished while they

---

8. In its moving papers Mass. Bay states that the policy excludes stock. "Stock" was excluded from four (4) of the coverages or policies, but it was not excluded from the business income coverage and extra expense form. Nevertheless, raw or fine gold is not covered by the business interruption policy because its "period of restoration" is nil.

9. In its Memorandum of Law in Opposition, etc. at 9–12 (doc. # 81) Eurospark attempts to persuade the Court that the policy's absence of a definition for the term "manufacture" permits resort to the dictionary definition. Doc. # 81 at 9. The policy actually employs the term "manufactured" in a context sufficiently specific that the definition of "manufacture" is not relevant.

are still on spools. The dispute is not material because the Mass. Bay business income policy does not cover raw gold, *i.e.*, it has no period of restoration. Mass. Bay attempts to extend this reasoning to no coverage at all for this event because gold is a commodity available in a marketplace. Eurospark needed only to obtain more gold and it was, in effect, back in business; more accurately back in production. The period of restoration did not end because Eurospark was back in production. Mass. Bay's point assumes that a theft of this much gold from a business, which only makes gold jewelry, has no effect on its income, even though there is no dispute that some work was in process on the date of the robbery. Any layperson can understand that in this business the loss of work in process eventually results in the unavailability of product for current and/or future orders. The issue is for how long a period, but not for no period at all.

The distinction is significant in this case because Spiegel avers, as confirmed by documents, that the theft of the gold indebted him to Fleet Bank. Immediately after the robbery, Fleet converted a line of credit to a loan for $2,925,000 at a higher interest rate, doc. # 56 pt. 7 ¶ 19, which resulted in an interest payment of $111,914. In line with the 80% coinsurance provision, Bourget adjusted the number to $89,530 and included it in the business income claim pursuant to the "extra expense" coverage:

> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

Doc. # 37 Exh. 1. Thus, at the very least, it appears that even under a relatively short period of restoration, pursuant to the extra expense coverage, Mass. Bay is obligated to pay for the extra interest that Eurospark would not have paid but for the robbery.

 Neither of the extremes outside of the policy's coverage, *i.e.*, no time at all or one day proposed by the insurer against the one year or more proposed by the insured, provides the approach for calculating the period of restoration for the work in process, a time frame indisputably within the policy. Courtesy of evidence submitted by Spiegel, inferences arguably relevant to this issue are all over the proverbial lot. In his June 30, 1999 deposition Spiegel testified that Eurospark did not have any records which allowed it to distinguish the goods on hand as raw, work in process or finished. Friedman Aff. Exh. 7 (excerpt from Spiegel dep. 6/30/1999 at 35). When asked, "Is there any way for anybody to verify how much was raw, work in process or finished on the date of loss?", he answered, "I don't think so." *Id.* (excerpt from Spiegel dep. 6/30/1999 at 35–36). Verification may not necessarily be the same as knowledge because Spiegel, at least for purposes of arriving at his claim for labor against the Lloyds policy, seems to have known how much gold fell into which category:

> Q Do you know what percent of the inventory that was allegedly stolen was finished work in process or raw?
>
> A Raw obviously was very little because raw I counting fine gold and I do not keep fine gold in my vault for no reason. Finished goods we had probably around 75, 80 percent and about 25 percent work in progress.

*Id.* (excerpt from Spiegel dep. 6/30/1999 at 35). By the time of his affidavit of August 23, 2005, doc. # 56 pt. 8, Spiegel apparently remembered that there were records which would allow verification. In ¶ 23 he refers to an inventory of March 3, 1998,

just prior to the robbery, Mallin Aff. Exh. E, and a post robbery inventory of March 16, 1998, Mallin Aff. Exh. F, and concludes that these lists allow the distinction to be drawn between what on hand was raw, work in progress or finished. He adds that in general Eurospark kept no finished stock on premises. The process for determining the category in which an item on the March 3, 1998 inventory list fell rested entirely within Spiegel's judgment: "I engaged in a process of weighing each item prior to entering it into inventory. During the weighing process, I would observe the product and make the determination of what stage the product was in." Spiegel Aff. 10/20/2005 ¶ 35 (doc. # 47). Based on this exercise, Spiegel averred that nearly twenty percent (20%) of the gold in the inventory was in its raw form or in the early production stage. *Id.* ¶ 36. But at his earlier deposition in 1999 he testified that it was very little fine gold in the vault and 75% or 80% finished with 25% work in progress.

As the record demonstrates, in one glaring example, Spiegel attempts to explain discrepancies in his testimony through reference to context, which supposedly fails to alert him to specifics, *e.g.*, the Fleet account deposits and the Mosexpo transaction. Another example may appear in the record with respect to his testimony about whether he conducted an inventory in March 1998, *id.* ¶ 38, although to be fair, the existence of the inventory documents and who created them, as opposed to their authenticity and reliability, are not in dispute.[10] The significant point, however, is that Spiegel may have succumbed to his motive to testify favorably toward the insurance coverage under discussion or consideration at that moment. Obviously, when Eurospark wants to recover for labor, more finished goods means more labor went into the inventory and therefore more labor was stolen during the robbery. In contrast, under the business interruption coverage, more finished goods, the time period for replacement of which is not covered, means less time or period of restoration to reproduce the work in process that is covered and therefore a shorter theoretical period during which Eurospark lost income.

These observations do not alter the ultimate point hammered home by Mass. Bay, which is that the March 3, 1998 inventory and Spiegel's testimony concerning it do not permit a reasonable trier of fact to calculate, in a reasoned manner, the period of restoration for work in process or progress. Although Spiegel seems to indicate or hint that he can do so with reference to the inventory, neither he nor his expert nor his attorneys have actually done so in any submission. The Court is, quite frankly, at a loss to understand how the trier of fact will be able to calculate a period of restoration premised on an "inventory" which consists mostly of abbreviations and shorthand for items found in locations, such as a shelf or safe, accompanied by the weight, apparently in grams. For example, on the first page Spiegel

---

10. Spiegel was asked if he had conducted an inventory in March 1998 and answered that he had not. Prior to this question he was asked if he had ever advised anyone from BDO Seidman that he had conducted an inventory in March 1998. He responded with his own question, What do you mean?, immediately following which the examiner asked if Spiegel had ever conducted an inventory in March 1998 to which he answered that he had not. In his affidavit he attributes the negative answer to his understanding that the question had asked if he and BDO Seidman had conducted an inventory in March 1998. Given that the inquiry cannot or should not be misinterpreted by a reasonable witness, Spiegel's misunderstanding permits a trier of fact to infer that the witness had engaged in another quick shuffle.

indicates "earrings 2,412,00". With nothing more for a description, why shouldn't a trier of fact consider this item finished goods? Next entry, "Bangles 2,542,00", same observation. What do entries for "E.C." and "L.L." mean, and if "E.C." abbreviates "End caps", why has that term been spelled out in other entries? Another entry, "Bars for Wire 26,584,00," sounds like raw or fine gold, which is not covered. Similar observations apply to items entered on each of the fifteen (15) pages which set forth entries. Moreover, none of the entries indicates how far along any of the items were in the multiple step process outlined by Spiegel for chain or any other step(s) in processing.

In the context of summary judgment, however, the Court must draw inferences favorable to the opponent, not only from the evidence, but from the circumstances. Accordingly, unless Mass. Bay demonstrates that there is no theory by which Plaintiff may recover, it is not entitled to summary judgment. The Court has explained that the circumstance of the robbery of the gold must have had some impact on Eurospark such that there is a period of restoration and that during that period of restoration Eurospark incurred a covered "extra expense" of interest that it would not have otherwise incurred. Thus, because the record discloses a theory of recovery by which the trier of fact may find Mass. Bay liable, summary judgment should be denied.[11]

Based on the foregoing, I respectfully recommend that your Honor: (1) grant Lloyds' motion for summary judgment only with respect to Eurospark's claim for labor and otherwise deny it; and (2) deny

Mass. Bay's motion for summary judgment.

*NOTICE*

Any objections to this Report and Recommendation must be filed with the Clerk of the court, with a copy to the undersigned, within ten (10) days of receipt of the report. All requests for extension of time to file objections must be addressed to Judge Vitaliano and should not be made to the undersigned. Failure to file objections within the specified time waives the right to appeal any order or judgment entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

February 1, 2008.

---

**11.** The Court's conclusion moots Eurospark's argument that the manner in which one adjuster, at the choice of both insurers, investigated its claims under all of the policies extended the period of restoration. Doc. # 81 at 14–28. Eurospark has not explained how actual events extend a purely theoretical time frame, which comes into being when the covered event occurs.